**E.I. DuPONT DE NEMOURS AND COMPANY, Appellant**

**v.**

**Robert Earl ROYE and Diane Roye, Appellees.**

**No. 14–12–00740–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 12, 2014.

Rehearing and Rehearing En Banc Overruled Nov. 18, 2014.

---

questions, and the jury found in favor of Roye on both. Based on the jury's findings, the trial court signed a final judgment awarding Roye the damages found by the jury less settlement credits. DuPont appeals from that judgment.

Although DuPont raises multiple issues on appeal, we need only address the first and third because they are dispositive. In its first issue, DuPont contends the trial court erred when it submitted Roye's ordinary negligence cause of action to the jury because Roye was limited to a premises liability cause of action. In its third issue, DuPont contends that even assuming Roye was an invitee of DuPont at the time he was injured, Roye did not establish that DuPont owed Roye any duty regarding the condition of the premises that caused his injuries. Because we agree with DuPont on both its first and third issues, we reverse and render a take-nothing judgment.

Russell Manning, Corpus Christi, for Appellant.

Daniel P. Barton, Richard P. Hogan Jr., Houston, for Appellees.

Panel consists of Justices McCALLY and BUSBY and Former Justice SIMMONS.[1]

## OPINION

J. BRETT BUSBY, Justice.

Appellee Robert Earl Roye was burned seriously when he fell into a pool of hot water at a chemical plant owned by appellant E.I. DuPont de Nemours & Co. Roye sued DuPont, asserting both ordinary negligence and premises liability causes of action. The trial court submitted each cause of action to the jury in separate

### BACKGROUND

DuPont owns a chemical plant with multiple manufacturing units in LaPorte, Texas. Prior to 1999, DuPont owned and operated the entire facility, including a formaldehyde production unit and a tetrahydrofuran (THF) production unit. Formaldehyde is used in the manufacture of THF. Steam is a key component used in the production of the chemicals manufactured at DuPont's plant, as well as a by-product of the manufacture of formaldehyde. Because steam is used throughout the facility, there is a complex system of steam pipelines running through the DuPont plant. Roye was burned by hot condensate that had collected in a pool underneath one of the pipelines.

---

1. Former Justice Rebecca Simmons, sitting by assignment.

## A. DBW builds a steam pipeline for DuPont's plant.

In 1999, DuPont contracted with D.B. Western, Inc.—Texas (DBW) to supply formaldehyde and steam to DuPont's plant. As a result of this agreement, DBW built a formaldehyde manufacturing plant on land purchased from DuPont that was adjacent to but outside the fence surrounding DuPont's chemical plant. DBW also agreed to design and construct a pipeline system to transport the formaldehyde and steam to the DuPont plant. The pipeline system consists of a pipeline support rack elevated twenty-six feet above the ground that carries separate pipelines for formaldehyde and steam. DuPont agreed it would be responsible for routine visual inspection and maintenance of the portion of the pipeline system located within its facility. Once construction was complete, this responsibility was assigned to DuPont operators working in the THF unit. Roye was one of those DuPont operators.

DuPont had final authority over the design of the pipeline system on its premises, and it also served as the construction manager for the project. As steam travels along the pipeline, some of the steam condenses into liquid. To remove this condensate from the pipeline, six steam traps were built into the part of the pipeline traversing DuPont's property. Steam traps, like all other parts of the units in a chemical plant, require regular maintenance because they wear out and can also malfunction.[2] As a result, DuPont had operators inspect the equipment in their areas of responsibility during every shift. In addition, DuPont hired an outside company, Spirex Sarco, to survey all of the steam traps within the DuPont facility regularly. These surveys continued after DuPont sold the THF unit to Invista, S.a.r.l. in 2004. Finally, every employee working inside the DuPont facility, whether an employee of DuPont or Invista, was charged with the responsibility to report any malfunctioning equipment they observed.

DBW asked DuPont to provide a specification for disposing of the condensate from the six steam traps. In response to this request, DuPont sent DBW "Specification P6D Condensate Disposal French Drain Method." P6D calls for the installation of a French drain—consisting of a clay or concrete pipe two feet in diameter that is buried vertically in the ground and filled with crushed stone or gravel—beneath a steam trap.[3] When the steam trap suspended from the pipeline discharges hot condensate, the French drain catches it and gives it time to cool to a safe temperature before releasing it into a storm sewer or drainage ditch. The design of the DBW steam pipeline, as approved by DuPont, called for the installation of French drains under all six steam traps on DuPont's property.

Although the design called for the installation of French drains under all six steam traps, they were only installed under two. The four remaining steam traps discharged the condensate directly onto the ground. Gerald Hirst, DuPont's corporate representative during trial, testified that discharging hot condensate onto the ground could be a safe alternative "when all parties agree that it's a safe location that people are not accessing on a regular

2. Van Mayberry, a DuPont mechanic at the LaPorte facility, testified that steam traps can fail and then start working properly again. Mayberry described steam traps as unpredictable.

3. According to Specification P6D, French drains are not the preferred method for dis-

posing of hot condensate, which is a valuable commodity. P6D provides: "where conditions make it difficult to dispose of hot condensate by preferred methods, a French drain, constructed in accordance with this standard may be used."

basis." According to Hirst, DuPont's on-site construction supervisors John Ponder and Oscar Gonzalez made the decision that it was safe to not install four of the French drains.[4] Both Ponder and Gonzalez testified at trial, and each denied making the decision to not install these French drains. Gonzalez testified that the decision to not install the drains was made by the DuPont design review team during a construction status meeting. Ponder testified that the steam traps where the French drains were not installed were located in "open territory within the plant site."

The DBW steam pipeline is part of a complex steam distribution system at the DuPont facility. Steam is generated by producers such as DBW and Co–Gen, an electricity generator. The steam producers send the steam through metered pipelines to the DuPont steam header. From the steam header, the steam is transported to the different units located inside the DuPont facility, including the Invista THF unit, through additional pipelines. Ponder explained that while the DBW steam pipeline could ordinarily be shut down without also requiring DuPont to shut down its operations, the system requires that a balance be maintained between the supply of steam entering the system and the amount of steam exiting the system.

**B. Invista buys part of the plant, hires Roye, and contracts to inspect the pipeline.**

In 2004, DuPont sold the THF unit to Invista. The sale did not include the land; instead, DuPont and Invista entered into a long-term ground lease. Once DuPont sold the THF unit, the DuPont facility became a shared industrial complex located within a single fence line. In other words, there were no internal fences separating the Invista THF unit from the remainder of the facility. The ground lease granted Invista shared and non-exclusive easements to all "areas used by Invista on the Plant Site on the date of [the] Lease." These shared and nonexclusive easements included the route of the DBW pipeline.

When DuPont sold the THF unit, the DuPont employees working in that unit, including Ponder and Roye, became Invista employees.[5] The employees' job duties did not change as a result of the sale. When it purchased the THF unit, Invista contracted with DBW to purchase the steam produced by DBW's formaldehyde plant. Invista also contracted with DBW to inspect and maintain the DBW pipeline system located "on its site."

**C. A pool of hot water develops in the ground under pipeline steam trap 5, and Roye falls into it and is seriously injured.**

On February 6, 2008, a DuPont employee gave his supervisor a work ticket reporting that steam trap 5 on the DBW steam pipeline was malfunctioning by "blowing through" steam.[6] Steam trap 5 was located in the DuPont portion of the shared industrial complex, and it was one of the DBW steam traps without a French drain underneath to catch the released condensate. The DuPont supervisor

4. John Ponder was a DuPont employee at the time the DBW pipeline was constructed. Oscar Gonzalez was a Kellogg, Brown & Root employee serving as a field construction coordinator for projects at DuPont's facility. Neither was an engineer.

5. Invista hired Gonzalez as its maintenance supervisor in 2006.

6. This steam trap is identified as steam trap 1360 on the Spirex Sarco surveys. It was primarily identified during trial as steam trap 5 because of its location on the DBW pipeline. We adopt that identification here.

passed the ticket up the line, where a DuPont planner and a DuPont scheduler determined that the malfunctioning steam trap was DuPont's responsibility to repair. As a result of this decision, a DuPont work order was generated, and a supervisor gave it to a DuPont operator to set up the repair. After the operator had set up the job, on March 5, 2008, a DuPont supervisor gave a work order to DuPont mechanic Van Mayberry to go out and repair the malfunctioning steam trap. Mayberry testified that once he received a work order, he would complete the repair if he could do it safely, and that it did not matter to him which company owned the part being repaired.

After receiving the work order, Mayberry went to steam trap 5. He observed a wooden pallet at the edge of a water-filled hole approximately two to three feet across and one foot deep. According to Mayberry, the water in the hole extended underneath the leading edge of the pallet, which was within arm's reach of the steam trap hanging from the pipeline above. Mayberry stepped onto the pallet to keep his shoes dry and examined the steam trap. Mayberry determined that he could not safely repair the trap because the job required the DBW steam pipeline to be shut down.[7] Mayberry made that notation on the work order and turned it in to his supervisor as incomplete. Mayberry testified that he heard at a later time that steam trap 5 was not DuPont's and he did not know what happened to the steam trap after that date. Mayberry did not report the hole he encountered during his attempt to repair steam trap 5 because "everybody knew there was a hole out there where the steam trap had been blowing."

In 2009, Roye worked as an operator in Invista's THF unit. As an operator, Roye's duties included visually inspecting the DBW pipeline each shift. While inspecting the DBW pipeline on April 7, 2009, Roye observed steam trap 5 continuously blowing steam. Recognizing that the steam trap had malfunctioned, Roye wrote up and submitted a work notification of the malfunction. Ron Hickman, another Invista employee, testified that Roye was training him as an operator when they observed the malfunctioning steam trap. According to Hickman, there was a pool of steaming water beneath the steam trap that he estimated was approximately four feet by six feet in size.

On May 5, 2009, Roye reported for work and spoke with Oscar Gonzalez. Gonzalez told Roye that he had work tickets for the repair of steam traps on the DBW pipeline on the day's schedule, and he asked if Roye could look at them to determine whether they could be set up for mechanics to perform the repairs. According to Roye, the first step in setting up a repair job for the mechanics is to determine whether a tagging or lock out list is on the computer.[8] When Roye determined there was not a list on the computer, he decided to go to the steam trap, make the list, and then enter it into the computer.

Roye drove a golf cart to steam trap 5 and parked it about ten feet away from the pallet and pool of condensate. Roye testi-

---

**7.** Mayberry testified that a DuPont operator had already noted on the work order that the valve handle was missing, and Mayberry concluded there was no way to isolate the steam trap.

**8.** According to Roye, the lock out list is created by an operator and it establishes the procedure an operator will use to set up the steam trap to be repaired safely. This list would be reviewed by another operator and if both operators agreed, it would be submitted to a supervisor for approval. Only after the supervisor approved the list would the operator go to the steam trap and actually perform the set-up procedure.

fied that he observed the steam trap blowing, the ground with grass around the pool, and the wooden pallet. Roye testified that he walked up to the pallet and could clearly see the bottom slats with the ground and grass underneath them. Roye also saw that there was some water underneath the pallet. Roye examined the steam trap and noticed the missing valve handle. Roye knew there was a small tag on the valve identifying the type of valve. With this information, Roye could possibly obtain a replacement handle that would enable the steam trap to be repaired without waiting for the entire line to be shut down. Roye testified that he needed to get close enough to the valve to read the small tag.

According to Roye, the blowing steam trap was about one-and-a-half feet away from the pallet. Roye testified he was accustomed to working around blowing steam traps because he had frequently been required to do so during his lengthy career at the DuPont facility. After visually examining the pallet, Roye pushed down on the pallet with his foot to test it for integrity. When it seemed safe, Roye stepped up on the pallet. Roye testified that when he took the next step, the ground gave way beneath the pallet like a trap door opening, dropping him into the pool of 400–degree condensate. Roye used the pallet to pull himself out of the pool, but not before he suffered second- and third-degree burns over 75% of his body, from his chest down to his feet. Roye was able to call for help on his radio and when his co-workers found him, he was taken to the hospital by helicopter ambulance. This began a 70–day hospital stay followed by treatment at two different rehabilita-

tion hospitals. As a result of his burns, Roye has significant permanent impairments.

**D. Roye sues DuPont and obtains a judgment in his favor.**

Roye filed suit against DuPont and other defendants alleging two principal causes of action: premises liability and negligence in the design, construction, and maintenance of the steam pipeline and steam traps. Roye's wife, Diane Roye, asserted a loss of consortium cause of action.[9] Under his premises liability theory, Roye alleged that he was an invitee of DuPont. He further alleged that the pool of hot condensate presented an unreasonable risk of harm because it eroded the soil beneath the surface, creating an unsupported ledge that collapsed under Roye's weight, dropping him into the pool. Under his negligence cause of action, Roye alleged that DuPont negligently designed the DBW pipeline because it made the decision to omit a French drain under steam trap 5, which he further alleged would have prevented the creation of the hot pool of condensate and subsurface soil erosion. Prior to trial, he settled his claims against DBW, nonsuited other defendants, and proceeded to trial against DuPont.

At the conclusion of the evidence, the trial court submitted both theories of liability to the jury as well as a question asking whether Roye was an invitee of DuPont. The jury found that Roye was an invitee of DuPont and also found DuPont liable under both the negligence and premises liability theories. The trial court signed a judgment against DuPont for $11,568,627.35, which equaled the damages

9. Because Mrs. Roye's claims are derivative of her husband's, we do not address her claims separately. *See In re Labatt Food Servs., L.P.,* 279 S.W.3d 640, 646 (Tex.2012) (observing that loss of consortium claims are derivative in the sense that family members must establish that the defendant is liable for the injured family member's injuries in order to recover damages).

found by the jury reduced by settlement credits. This appeal followed.

ANALYSIS

As mentioned above, DuPont brings four issues on appeal challenging the judgment against it. Because they are dispositive of this appeal, we need only address the first and third issues.

## I. Because Roye was injured by a condition of DuPont's premises, the trial court erred by submitting an ordinary negligence question against DuPont.

Question 1 of the jury charge asked the jury "did the negligence, if any, of [DuPont, DBW, Invista, or Roye] proximately cause the occurrence in question?" Question 1 included standard common-law negligence definitions based on the Texas Pattern Jury Charges.[10] The trial court also instructed the jury that in answering Question 1, it should "not consider DuPont's negligence, if any, in its role as premises owner, as set forth in Question 4." During the charge conference, DuPont objected to the submission of Question 1 because the "case law is very clear the case should only be submitted as a premises condition liability case and not as a general negligence case." The trial court overruled the objection. The jury found that all four parties listed in Question 1 were negligent.

In its first issue, DuPont argues the trial court erred when it overruled the objection and submitted this ordinary negligence theory to the jury. We agree.

## A. We review the legal correctness of the jury charge de novo.

A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex.R. Civ. P. 278; *Hatfield v. Solomon*, 316 S.W.3d 50, 57 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex.1999)). The goal is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Hatfield*, 316 S.W.3d at 57. To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. *Id.* We review whether a challenged portion of a jury charge is legally correct using a de novo standard of review. *Id.* (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex.2003)).

## B. Roye was not injured as a contemporaneous result of a negligent activity by DuPont, so he is limited to a premises liability claim.

Under Texas law, a person injured on another's property has two potential causes of action against the owner of the property: (1) a negligence claim for negligent activity on the premises, and (2) a premises liability claim for an unreasonably dangerous condition on the premises. *Clayton W. Williams Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex.1997); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex.1992). Although both liability theories are based on negligence principles, they are independent theories that require different elements of proof. *Olivo*, 952 S.W.2d at 529. When the alleged injury is the result of a negligent activity, the injured party must have been injured by, or as a contemporaneous result of, the activity itself. *Keetch*, 845 S.W.2d at 264. When the alleged inju-

---

**10.** Question 1 defined "negligence" as the "failure to use ordinary care, that is failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances or doing that which a person or company of ordinary prudence would not have done under the same or similar circumstances."

ry is caused by an unsafe or dangerous condition on the premises, the injured party is limited to a premises liability theory and must prove his status to establish the type of duty owed by the premises owner. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006); *see H.E. Butt Grocery Co. v. Warner,* 845 S.W.2d 258, 259 (Tex.1992); *Wyckoff v. George C. Fuller Contracting Co.,* 357 S.W.3d 157, 163–64 (Tex.App.-Dallas 2011, no pet.). Artful phrasing of the pleadings to encompass alleged design defects or any other theory of negligence does not affect the application of premises liability law. *Wyckoff,* 357 S.W.3d at 163.

■ In the present case, Roye has not alleged or offered evidence that he was injured as a contemporaneous result of an activity by DuPont. Instead, Roye seeks to hold DuPont, the current owner of the premises, liable for his injuries caused by an allegedly unsafe or dangerous condition on DuPont's premises: a pool of hot condensate that resulted in concealed subsurface erosion of the soil. Because Roye's claim is based on an unsafe or dangerous condition of the property, we hold that the cases cited above limited him to a premises liability theory of recovery.

Roye asserts that a premises owner can also be found liable for ordinary negligence if it played a role in designing an improvement that creates a hazardous condition over time, but he identifies no cases applying that rule to a current premises owner. It is of course true that a person injured by such a condition may have a cause of action against the premises owner, but the cases just discussed confirm that the action sounds in premises liability, not ordinary negligence.

The cases on which Roye relies are distinguishable because they involve defendants who did not own or control the premises at the time the alleged injuries occurred. *See In re Weekley Homes, L.P.,* 180 S.W.3d 127, 132 (Tex.2005) ("[A] contractor performing repairs has an independent duty under Texas tort law not to injure bystanders by its activities, or by premises conditions it leaves behind."); *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 54 (Tex.1997) (stating that person who creates a dangerous condition owes a duty of care even if person is not in control of the premises at the time of the injury); *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex.1997) (observing in summary judgment case that court had "recognized that under some circumstances, one who creates a dangerous condition, even though he or she is not in control of the premises when the injury occurs, owes a duty of due care"); *City of Denton v. Page,* 701 S.W.2d 831, 835 (Tex.1986) (observing that "a private person who has created a dangerous condition may be liable even though not in control of the premises at the time of injury"); *Strakos v. Gehring,* 360 S.W.2d 787, 790 (Tex.1962) (stating that contractor who left dangerous condition on premises can still be held liable even though contractor's work had been accepted and another had assumed control of the premises); *Jenkins v. Occidental Chem. Corp.,* 415 S.W.3d 14, 30–33, 39 (Tex.App.-Houston [1st Dist.] 2013, pet. filed) (remanding for entry of judgment in favor of injured chemical worker because former premises owner could be held liable for negligent design of acid addition system).

These cases establish that a person who formerly owned or controlled property and created a dangerous condition is not insulated from liability when it sells or departs from the property and leaves the condition behind. But this principle does not apply to our case, in which DuPont still owns the property and can be sued on a premises liability theory.

Because Roye was limited to a premises liability theory of recovery, we sustain Du-

Pont's first issue and hold the trial court erred when it submitted an ordinary negligence cause of action against DuPont to the jury. *See Shumake,* 199 S.W.3d at 284; *Warner,* 845 S.W.2d at 259; *Wyckoff,* 357 S.W.3d at 163. Accordingly, the jury's finding that DuPont was negligent is immaterial and cannot support a judgment against DuPont. *See Se. Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 172 (Tex.1999) (stating that jury finding on a question that should not have been submitted is immaterial and may be disregarded); *Nat'l City Bank of Ind. v. Ortiz,* 401 S.W.3d 867, 883 (Tex.App.-Houston [14th Dist.] 2013, pet. denied) (same); *see also Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994) (stating rendition is appropriate when submitted jury question is immaterial).

## II. Because the evidence does not show DuPont had actual or constructive knowledge of the concealed hazard, Roye failed to establish that DuPont owed him a duty under premises liability law.

Turning to Roye's premises liability theory, DuPont contends in its third issue that there is insufficient evidence it owed Roye a duty to protect him from the obvious danger posed by the open pool of hot condensate. DuPont begins its argument by accepting, for purposes of this issue, that Roye was DuPont's invitee when he was injured as a result of his fall into the pool. DuPont then asserts that the only duty it owed Roye as an employee of an independent contractor working on its premises was a duty to protect him from concealed hazards that DuPont knew about or could have discovered through a reasonable inspection. DuPont concludes that because there was no evidence it knew or should have known about the concealed hazard Roye alleges caused his fall into the pool of hot condensate, the

judgment against it must be reversed and a take-nothing judgment rendered. We agree with DuPont.

## A. Whether DuPont knew or should have known of a concealed hazard that caused Roye's injury is a legal question.

As in any negligence action, a defendant in a premises liability case is liable only to the extent it owes the plaintiff a legal duty. *Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 217 (Tex.2008). The plaintiff bears the burden to produce evidence of duty, and liability cannot be imposed if no duty exists. *Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex.2006); *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). Whether a duty exists is a question of law for the court to decide from the facts surrounding the occurrence at issue. *Golden Spread Council, Inc. No. 562 of the Boy Scouts of America v. Akins,* 926 S.W.2d 287, 289 (Tex.1996); *Pico v. Capriccio Italian Rest., Inc.,* 209 S.W.3d 902, 906 (Tex.App.-Houston [14th Dist.] 2006, no pet.). Although our dissenting colleague argues forcefully that we should honor the jury's verdict in this case, we are also required to follow the supreme court's holding that the existence of a duty in a premises liability case is "not for the jury to decide under comparative negligence or anything else." *Moritz,* 257 S.W.3d at 217. Once the plaintiff establishes that a defendant owed a duty, he must also prove the defendant breached that duty and the breach proximately caused damages. *Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 767 (Tex.2010).

Generally, a property owner owes invitees a duty to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition that the property owner knew or should have known about. *Id.* That duty is modi-

fied when the plaintiff is an employee of an independent contractor, as Roye was here. *Moritz*, 257 S.W.3d at 215; *Wilhelm v. Flores*, 195 S.W.3d 96, 98 (Tex.2006) (per curiam) (stating that premises owner owed employee of business invitee, who was on premises to remove bee hives purchased by invitee, no greater duty than that owed to employee of independent contractor); *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 & n. 1 (Tex.1999).

■■■ A premises owner has no duty to warn such employees of open and obvious hazards or to make those hazards safe, but the owner does have a duty with respect to pre-existing concealed hazards that it knows or should have known about. *Moritz*, 257 S.W.3d at 215–16; *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex.2000).[11] More specifically, a landowner may be liable for injury caused by concealed deterioration of its premises if it knew the premises had become unsafe or a reasonable inspection, if conducted, would have discovered that the deterioration had caused an unsafe condition. *CMH Homes, Inc.*, 15 S.W.3d at 101. Evidence that a property owner knew of a safer, feasible alternative design, without more, is not evidence that the owner knew or should have known that a condition on its premises created an unreasonable risk of harm. *Id.* at 102.

**B. Roye failed to establish that a reasonable inspection would have revealed the ledge beneath the ground near the hot pool of condensate.**

To meet his burden to establish that DuPont owed him a legal duty, Roye first had to establish the existence of a concealed hazard. *Moritz*, 257 S.W.3d at 215; *CMH Homes, Inc.*, 15 S.W.3d at 101. We

must therefore determine the nature of the hazardous condition that injured Roye. The parties acknowledge, and we agree, that the hazard was not the steam trap hanging from the elevated pipeline and discharging hot condensate. Rather, the hazard was located in the ground underneath the steam trap.

■■■ DuPont argues that the hazard was the pool of hot condensate that had developed in the ground, and that it owed no duty to warn of this hazard, which was open and obvious. But the visible pool was not the only hazard. Roye offered evidence that the condensate had eroded the subsoil beneath the surface of the ground adjacent to the pool over time, creating an unsupported ledge of topsoil that collapsed when Roye stepped onto the pallet that rested on this ledge. Other courts have recognized that even when certain aspects of a hazard are open and obvious, the premises owner may still be liable if the specific conditions that caused the employee's injury were concealed. *Griffin v. Shell Oil Co.*, 401 S.W.3d 150, 160–61 (Tex.App.-Houston [1st Dist.] 2011, pet. denied); *see also Kilchrist v. Sika Corp.*, No. 3:10–CV–2567–B, 2012 WL 3599383, at *2 (N.D.Tex. Aug. 22, 2012), *aff'd*, 555 Fed.Appx. 350 (5th Cir.2014).

We conclude the record contains abundant evidence that the ledge of topsoil next to the pool of hot condensate was a concealed hazard on the day Roye went to set up the repair of steam trap 5. Roye's safety expert identified this ledge as the hazard that caused Roye's injury. There is no evidence in the record, however, that DuPont had actual knowledge of the concealed ledge at any relevant time. There-

---

11. *See also Coastal Marine Servs. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225 (Tex.1999) (per curiam); *cf. Del Lago Partners*, 307 S.W.3d at 767 (considering as part of legal duty analysis whether owner knew or had reason to know of an unreasonable and foreseeable risk of harm).

fore, we turn to whether the record established that DuPont had constructive knowledge of an unreasonable risk of harm associated with stepping on the ground near the pool.

In premises cases, constructive knowledge can be established by showing that the hazardous condition existed long enough for the owner to have discovered it through a reasonable inspection. *CMH Homes, Inc.*, 15 S.W.3d at 102–03. Here, while there is abundant evidence a concealed hazard existed the day of the occurrence, there is no evidence in the record demonstrating when the open and obvious pool of hot condensate created the concealed ledge. The mere passage of time between Mayberry's use of the pallet when he unsuccessfully attempted to repair steam trap 5 in March 2008 and Roye's fall into the pool of hot condensate when he stepped onto the pallet in May 2009 is insufficient to establish that DuPont had constructive knowledge of the concealed hazard. *See id.* at 101 (holding knowledge that stairs would become unstable after passage of twelve to fifteen months simply by virtue of use was insufficient to establish constructive knowledge of dangerous condition).

Roye does not contend, and there is no evidence in the record indicating, that DuPont failed to conduct any inspections of its premises.[12] *See Moritz*, 257 S.W.3d at 215 (stating property owner has duty to inspect premises). In addition, there is no evidence in the record establishing what type of reasonable inspection a landowner in DuPont's position should undertake, or that such a reasonable inspection would

have revealed the ledge—a concealed hazard that every witness who testified on the subject agreed could not have been discovered through a visual inspection. *See CMH Homes, Inc.*, 15 S.W.3d at 102 (stating plaintiff "would be entitled to recover if he presented evidence that [the defendant] actually knew that the platform and step unit had become unstable or if a reasonable inspection would have revealed that the unit was no longer safe"); *see also Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 884 (Tex. 2009) ("Here, no evidence was presented that Fort Brown actually knew the chair [that broke] had become dangerous or that Fort Brown failed to reasonably inspect the chairs.").

In his brief, Roye points to various types of evidence that he argues support charging DuPont with constructive knowledge. This evidence includes the opinion of DuPont's geotechnical engineer that the hole containing the hot condensate developed and grew over a long period of time. Roye also emphasizes that DuPont knew about the pool of hot condensate but did not erect barricades around it. In addition, our dissenting colleague explains how hot water released from the steam trap under pressure eroded the soil beneath to create a hole that filled with hot water.[13] But the erosion-created hole and the pool of hot condensate were open and obvious conditions of which everyone had actual knowledge, and as to which DuPont owed Roye no duty. Thus, the facts that the hole was created by erosion over a substantial length of time, and that DuPont knew about the hole and did not place barricades around it, cannot be used

---

12. In fact, Roye admits throughout his appellate briefing that DuPont conducted inspections of the premises.

13. Much of the erosion testimony on which the dissent relies came from Roye's geotechni-

cal engineering expert and was not specific to this case. The expert was not asked to do any independent analysis of soil conditions at the accident site and determine what happened.

to impute constructive knowledge of the concealed hazard—the hidden ledge near the hole—to DuPont. *See Moritz,* 257 S.W.3d at 215–16; *CMH Homes, Inc.,* 15 S.W.3d at 101.

 Next, Roye contends that Du-Pont's commissioning of surveys to track the functioning of the steam traps on its premises, and Mayberry's failed attempt to repair steam trap 5, impute constructive knowledge to DuPont. As noted above, however, the malfunctioning steam trap is not the hazard that injured Roye. Roye's argument is also contrary to the testimony of his own safety expert, who opined that steam trap 5's malfunction had no effect on the development of the pool of hot conden-sate and the concealed subsurface ledge.

 Finally, Roye points to DuPont's decision to not install a French drain un-der steam trap 5 as called for by its design standard.[14] But the supreme court has determined that a premises owner's aware-ness of a safer and feasible alternative design, without more, is insufficient to im-pose constructive knowledge of a hazard-ous condition on DuPont. *CMH Homes, Inc.,* 15 S.W.3d at 102 ("To our knowledge, no court has ever suggested that if it is possible to construct buildings or fixtures with materials that are impervious to wear and tear, an owner has a legal duty to do so and is charged with knowledge of an unreasonably dangerous condition if it does not."); *see also Brookshire Grocery*

*Co. v. Taylor,* 222 S.W.3d 406, 407–08 (Tex. 2006) ("Ordinarily, an unreasonably dan-gerous condition for which a premises owner may be liable is the condition at the time and place injury occurs, not some antecedent situation that may have pro-duced the condition.").

Roye also asserts that a French drain was necessary because DuPont knew steam traps created the risk of holes and cave-in problems, and that careful inspec-tion was essential to detect such stability problems. But the evidence Roye cites does not support this assertion. Rather, it shows that soil borings dug to determine the proper foundations for the rack sup-porting the elevated pipeline revealed mostly clay throughout the soil profile,[15] but one boring 150 feet west of the line revealed sand below eight feet in depth, which a DuPont consultant reported could create stability problems requiring special construction procedures. In the opinion of Roye's own geotechnical engineering ex-pert, however, soil testing conducted a mere 20 feet from the site of the injury has absolutely no predicting power regarding conditions at the site. Accordingly, the existence of sand at least 150 feet away and at eight feet in depth would not sug-gest to DuPont that stability problems ex-isted at the site of Roye's injury or at three feet in depth, which was the approxi-mate depth of the hole at the time of his injury.[16]

---

14. Part A of the Background section above summarizes evidence that DuPont considered discharging condensate onto the ground to be a safe alternative when all parties agree that people do not regularly access the location, and that the DuPont design review team ap-proved the decision to use that method of discharge. The dissenting opinion correctly points out, however, that there is evidence such discharge causes erosion and that Du-Pont's French drain design mitigates erosion.

15. There was also evidence from DuPont's geotechnical engineering expert that the soils at the plant site were consistent sandy clays and clays.

16. The dissenting opinion also points to evi-dence that DBW wanted to drill the pits for the French drains (two of which were ulti-mately installed) at the same time it drilled the foundations for the pipeline support rack. We fail to see how this evidence of efficient construction management indicates that Du-Pont had reason to suspect there was sand

Our dissenting colleague agrees with Roye and points to the testimony of his safety expert. Based on the evidence just discussed regarding DuPont's decision to omit the French drain and its knowledge of soil borings, as well as the tendency of condensate to openly and obviously erode the soil and pool, Roye's safety expert opined that the hazard of an unsupported ledge of topsoil next to the pool could be reasonably expected to occur. As previously explained, however, supreme court precedent compels the conclusion that the evidence on which the expert based his opinion does not support constructive knowledge of the concealed hazard. Moreover, even if that evidence could support his opinion, the supreme court has held that constructive knowledge that a hazardous condition *could* be reasonably expected to occur at some future date is insufficient. *CMH Homes, Inc.*, 15 S.W.3d at 102 (rejecting argument that defendant "at least had constructive knowledge of the condition of the steps because it knew the steps could become unstable"). Rather, there must be evidence that the condition *did* occur a sufficient length of time before the injury and that a reasonable inspection would have revealed it. *Id.* at 102–03; *see also Brookshire Grocery Co.*, 222 S.W.3d at 407–08. As already discussed, there is no such evidence in this record.

 Our dissenting colleague also contends this conclusion regarding constructive knowledge is beside the point, as the jury was allowed to infer under *Keetch* that DuPont had actual knowledge of the

unsupported ledge of topsoil near the pool because it "created the defect" by omitting a French drain. *Post,* at 64–65, 67. We conclude the dissent's reliance on *Keetch* is misplaced for three reasons.

First, *Keetch* understandably did not involve a challenge to whether the premises owner supermarket owed a legal duty to the plaintiff shopper; certainly it did. In this case, however, DuPont's position is that it owed Roye no duty as an independent contractor's employee because the only defect it knew or should have known about was open and obvious. The question of duty is one for the court to decide (nothing in *Keetch* says otherwise), and an inference that DuPont had actual knowledge of an open and obvious defect—the erosion-created hole filled with hot water that resulted from the omission of a French drain—cannot support a duty as explained above.

Second, *Keetch* did not hold that creating a condition always supports an inference of knowledge, but merely that it "may" do so if there is also evidence the defendant "knew" or should reasonably have foreseen from an inspection that the condition "presented an unreasonable risk of harm." 845 S.W.2d at 265, 266; *Seideneck v. Cal Beyreuther Assocs.*, 451 S.W.2d 752, 754–55 (Tex.1970) (holding that although defendant placed rug on which plaintiff tripped, there was legally insufficient evidence it should reasonably have foreseen from inspection a probability that the rug would result in injury).[17] Here, as

right under the topsoil at the site of Roye's injury.

17. *See also Knox v. Fiesta Mart, Inc.,* No. 01–09–01060–CV, 2011 WL 1587362, at \*5 (Tex. App.-Houston [1st Dist.] April 21, 2011, no pet.) (holding actual knowledge of placement of object is not evidence of actual knowledge that object presented a hazard). The dissent concedes as much: "it isn't enough that the

owner simply created a condition that turns out to 'be hazardous;" there must also be evidence "that an owner has created a condition that it could reasonably foresee poses an unreasonable risk of harm" for the inference of knowledge to arise. *Post,* at 65–66. This principle is not inconsistent with our opinion in *Grayson v. Anselmo,* No. 14–06–01073–CV, 2008 WL 660433 (Tex.App.-Houston [14th

previously discussed, there is no evidence DuPont had either actual or constructive knowledge of an unreasonable risk of harm to those stepping on the concealed ledge of apparently solid ground adjacent to the open and obvious hole filled with hot water.

Third, *Keetch* and similar cases address arguments that knowledge should be inferred when the defendant "created a condition that posed an unreasonable risk of harm" at the time it was created, even though the harm may have occurred later. 845 S.W.2d at 265; *see also CMH Homes*, 15 S.W.3d at 101 (explaining that grape display in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex.1983), "constituted a dangerous condition from the moment it was used").[18] Indeed, it is the temporal connection between the defendant's creation of the condition and its dangerousness that makes it plausible to infer the defendant knew of the danger.[19] Here, there is no evidence that the ground near the steam trap posed an unreasonable risk of harm at the time DuPont omitted a French drain. Rather, the concealed ledge developed over the next several years. For these reasons, *Keetch* does not support an inference of actual knowledge in this case. As discussed above, *CMH Homes* provides the framework for analyzing knowledge of conditions that develop and become dangerous over time. 15 S.W.3d at 102–03.[20]

---

Dist.] Mar. 11, 2008, no pet.) (mem. op.). *Grayson* cannot overrule *Seideneck* and *Keetch*, nor does it purport to do so. *Grayson* did not address a duty dispute, and the defendant there did not argue that even if he created the condition (an inadequately attached railing on a ramp), he could not reasonably foresee that it presented an unreasonable risk of harm. Thus, we had no occasion to address *Seideneck*'s holding on that issue. Instead, we held that an implied finding in a bench trial that the defendant did not have constructive knowledge of the dangerous condition was not against the great weight and preponderance of the evidence. *Id.* at *4.

18. In *Keetch*, the plaintiff alleged the defendant's employee "put the foreign substance [on which the plaintiff slipped] on the floor." 845 S.W.2d at 265. The dissent's illustrations of a freezer lid balanced precariously against a table leg and a lit bomb with a long fuse also fall within this category of cases in which the condition posed an unreasonable risk of harm from the time it was created. *See Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 645–46 (Tex.App.-Houston [1st Dist.] 2005, pet. denied); *Post*, at 65–66, 66–67.

19. *Keetch*, 845 S.W.2d at 266; *Coffee v. F.W. Woolworth Co.*, 536 S.W.2d 539, 540 (Tex. 1976) (holding store personnel in process of changing display had actual knowledge of its empty and dangerous condition); *Rice Food Market, Inc. v. Hicks*, 111 S.W.3d 610, 613 (Tex.App.-Houston [1st Dist.] 2003, pet. de-

nied) (holding no evidence defendant had actual knowledge that sign posed unreasonable risk of harm where "there is no evidence in the record that the sign was a dangerous condition from the moment it was installed").

20. The dissent argues that *CMH Homes* is not applicable because it does not address actual knowledge of defects created by the owner. We disagree. The first part of the analysis in *CMH Homes* addresses that very issue, while the second part addresses constructive knowledge. In the first part, the supreme court discusses the plaintiff's theory that CMH had "actual knowledge" that the steps it installed presented an unreasonable risk of harm because it knew at the moment it installed the steps that they would become unstable. *CMH Homes*, 15 S.W.3d at 99. To support this argument, the plaintiff relied on *Corbin*, which the supreme court has described as a case about "when knowledge may be inferred from the creation of a condition." *Keetch*, 845 S.W.2d at 265. The supreme court distinguished *Corbin* and rejected the plaintiff's actual knowledge theory, however, concluding that the steps were not a dangerous condition from the inception of their use. *CMH Homes*, 15 S.W.3d at 101. As the court pointed out, the prospect of deterioration "does not necessarily mean that the owner or occupier has *created* a dangerous condition." *Id.* (emphasis added). Because this case likewise involves a condition that was not dangerous at inception but deteriorated over time, *CMH*

Because Roye did not present evidence demonstrating that a reasonable inspection would have discovered the concealed ledge, we hold as a matter of law that Roye failed to meet his burden to establish DuPont owed him a duty to warn of a concealed hazard that DuPont knew or should have known about. *See Moritz*, 257 S.W.3d at 215 (stating owner has duty to inspect premises and warn independent contractor's employee of concealed hazards owner knows or should have known about); *CMH Homes, Inc.*, 15 S.W.3d at 103 ("To impose constructive knowledge when the owner ... would not have discovered the dangerous condition from a reasonable inspection is to dramatically alter premise liability law."); *Wyckoff*, 357 S.W.3d at 165. We therefore sustain DuPont's third issue on appeal and hold that the jury's premises liability finding cannot support a judgment against DuPont.

CONCLUSION

Having sustained DuPont's first and third issues on appeal, we reverse the trial court's judgment and render judgment that appellees take nothing on their causes of action against DuPont.

McCALLY, J., Dissenting.

SHARON McCALLY, Justice, dissenting.

Appellee Robert Earl Roye suffered second and third degree burns over 75% of his body at the DuPont plant when the ground beneath a pallet he stepped upon to perform his work caved in, causing him to fall into a pool of 400–degree water up to his chest. Following a jury trial, the trial court entered judgment for the Royes on, *inter alia*, their premises liability claim

*Homes* supports our conclusion that the *Keetch* inference of actual knowledge does not

against DuPont. The majority reverses, concluding as a matter of law that DuPont did not owe Roye any duty regarding the condition of the premises that caused his injuries. Because I disagree, I respectfully dissent. I would affirm the judgment.

I agree with the majority's characterization of the hazard or defect at issue. Specifically, I agree with the majority that the defect is not the steam trap on the elevated piping. The majority concludes that the pool of hot condensate was a defect, but a visible one. Again, I agree. The majority acknowledges that the hollowing of subsurface soil adjacent to the pool of hot condensate, which created a ledge, was the defect. This defect on the premises was concealed because the surface layer of clay looked stable.

I agree with the majority that there is no direct evidence that DuPont had actual knowledge that the subsurface soil had eroded to the point that it had become unstable. There is no evidence that anyone else had actual knowledge or could have perceived from merely looking that the pallet rested precariously on the surface layer of clay atop a cavern created by erosion of subsurface sand.

I disagree that there is no evidence of DuPont's actual knowledge. The record contains direct evidence that DuPont created the hazardous premises condition which, under Texas law, creates an inference that DuPont had actual knowledge of the hazardous condition on its property. *See Keetch v. Kroger Co.*, 845 S.W.2d 262, 265 (Tex.1992). Roye did not need evidence that DuPont could have discovered this defect through a reasonable inspection because **DuPont created the defect.** Because DuPont created the premises defect, DuPont's knowledge became a question for

arise here.

the jury, and we must infer that DuPont had knowledge of that defect, consistent with the jury's verdict. *Id.* Therefore, I also disagree with the majority's (1) failure to analyze evidence of DuPont's actual knowledge under *Keetch* and (2) legal conclusion that duty in this case is a question of law for this appellate court.

## A. *Keetch v. Kroger* controls this premises liability cause.

In 1992, the Texas Supreme Court decided *Keetch v. Kroger Co.* Appealing a take-nothing judgment, Keetch urged that because Kroger created the hazardous condition at issue it should be charged with knowledge of the defect, as a matter of law. The *Keetch* Court refused to deem an owner's actual knowledge of the owner-created defect and held, instead, that "the fact that the owner or occupier of a premises created a condition that posed an unreasonable risk of harm may support an inference of knowledge." *Id.*;[1] *accord Coffee v. F.W. Woolworth Co.*, 536 S.W.2d 539, 542 (Tex.1976); *see also Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 645 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (stating that the inference established by *Keetch* is well-settled). But, the Court further held, "the jury still must find that the owner or occupier knew or should have known of the condition." *Keetch*, 845 S.W.2d at 265. The majority takes Justice Hecht's use of the word "may" out of context to suggest it somehow means that evidence that the owner created the defect might, in some case, be **no evidence** of duty. However, this construction places the majority opinion in direct conflict with our own precedent. We have previously held that duty becomes a question for the fact finder in an owner-created hazard because the inference arises. *See Grayson v. Anselmo*, No. 14–06–01073–CV, 2008 WL 660433, at *4 (Tex.App.-Houston [14th Dist.] Mar. 11, 2008, no pet.) (mem. op.) ("*Coffee* and *Keetch* stand for the proposition that a fact finder may, but need not, infer that a defendant had actual knowledge of a dangerous condition that it created. It is within the fact finder's province to decide whether the circumstances justify inferring actual knowledge against the creator of a dangerous condition.").

The *Keetch* Court then provided definition to circumstances in which the owner has created the condition for purposes of inferring knowledge. Specifically, it isn't enough that the owner simply created a condition that turned out to be hazardous. *See Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 754–55 (Tex.1970). The evidence must show that the owner created a condition "which poses an unreasonable risk of harm" in order to constitute circumstantial evidence of knowledge. *Keetch*, 845 S.W.2d at 266. An "unreasonable risk of harm" exists under Texas law if "there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Seideneck*, 451 S.W.2d at 754. Therefore, where evidence establishes that an owner has created a condition that it could reasonably foresee poses an unreasonable risk of harm, such evidence creates a fact issue for the jury on actual knowledge. *Hall*,

---

1. Justice Hecht's concurring opinion in *Keetch* makes clear that nothing more than an inference arises in owner-created defects because "it often happens that a person who creates a condition knows it at the time ... [b]ut this is not always so." *Keetch*, 845 S.W.2d at 267 (Hecht, J., concurring). There-

fore, creating the condition should not amount to "notice of the condition as a matter of law." *Id.* Here, upon evidence that DuPont created the condition, the trial court properly submitted the question of knowledge to the jury.

177 S.W.3d at 645–46 (holding that because Hall adduced evidence that Sonic left a freezer cover in an exposed, dangerous, and unstable position where it was foreseeable that it would fall to the floor, summary judgment on actual knowledge of the hazardous condition was reversible error).

The majority does not analyze DuPont's duty under *Keetch*. Instead, the majority focuses its duty analysis on the absence of evidence that DuPont had constructive knowledge of the ledge under the teachings of *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97 (Tex.2000). *CMH* does not control this case because the defect alleged—unstable steps and platform—was a defect that developed over time "simply by virtue of its use." *Id.* at 100–01. The *CMH* Court did not analyze or address defects created by the owner or the inference of actual knowledge that arises therefrom. Instead, finding no direct evidence of actual knowledge, the *CMH* Court analyzed constructive knowledge—because CMH did not create defective steps. *Id.* (stating that the issue in the case is "what are the legal consequences if premises will become unsafe over time and the owner or occupier is aware of that fact"). But, here, DuPont did not buy a non-hazardous ledge that became hazardous simply by virtue of its use.

We cannot construe *CMH* as applicable to owner-created, rather than use-created, hazards without ignoring *Keetch*. First, *CMH* and *Keetch* address completely different theories of premises liability: *Keetch* addresses premises liability for hazards created by a property owner and asks (the jury) whether the property owner knew that the condition it created was unreasonably dangerous. In so doing, *Keetch* authorizes an inference of actual knowledge. *CMH* addresses premises liability for hazards the property owner could anticipate would develop over time and asks whether the property owner knew or, through reasonable inspection, should have known had developed. *CMH* analyzes constructive knowledge. *Keetch* owner-created premises defects arise from malfeasance; *CMH* owner-should-have-discovered-the-premises-defect claims arise from nonfeasance. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex.2013) (discussing the difference between premises liability claims in malfeasance and nonfeasance). *CMH* does not apply.

Second, *Keetch* does not contain a temporal limitation. However, the majority's application of *CMH* to this case grafts a temporal limitation that does not exist for owner-created hazards. For example, in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex.1983), the Texas Supreme Court did not ask whether the floor became dangerous at the instant an employee dropped the grape or after a person first stepped on the grape and made it gooey and slippery. *CMH*, as applied by the majority, would eliminate any duty owed by Safeway for the hazard it created in the first place. Instead, in line with the post–*CMH* analysis we performed in *Grayson v. Anselmo*, we should confine our review of premises liability claims arising from owner-created hazards to *Keetch* and its progeny. *See Grayson*, 2008 WL 660433, at *3–4 (applying *Keetch*, without mention of *CMH*, to premises liability injury that occurred when the railing became separated from an owner-constructed ramp).

Finally, neither *Keetch*, *CMH*, nor any other Texas Supreme Court authority articulates a public policy to protect property owners from liability for hazardous conditions that they create but that do not cause immediate injury. A party's liability for affirmative acts of negligence or intentional conduct should not be eliminated by the fortuity of where the injury occurred. Stated differently, if a property owner

lights a long fuse on the bomb he places on his property, he may be held liable for injuries when it ultimately explodes without the necessity of further inspection of the remaining length of the fuse.

The majority also urges that no *Keetch* analysis is necessary is this case because, unlike the allegation that the owner put the foreign substance on the floor in *Keetch*, there is no evidence here that DuPont dug the hole. *See* Majority Op. 62–63. The majority's analysis misses the mark. We have agreed that the premises defect in this case is the ledge that resulted from hollowing. As outlined below, there is evidence that DuPont created the ledge through its decision not to provide drainage for its high-pressure hot condensate. Further, there is evidence that DuPont should have reasonably foreseen that the undrained hot condensate posed an unreasonable risk of harm not only through the pooling of hot condensate, but also through differential erosion beneath the surface clay. DuPont did dig the hole; they just didn't use a shovel.

We should affirm.

## B. There is evidence that DuPont created the condition.

DuPont created the condition, which is hollowing or erosion beneath the ledge that collapsed, throwing Roye into 400–degree condensate. The jury heard evidence that the ledge resulted from differential ground erosion at the point of condensate discharge from the steam trap near where Roye suffered his injury. The jury learned that discharging condensate is part of the design of the steam pipe system. The very purpose of the steam trap is to improve circulation of the valuable steam by eliminating unnecessary by-product, condensate. So, the design includes several spring-loaded steam traps to discharge the condensate from the pipe.

When the steam reaches 300 psi, the steam trap opens and condensate discharges downward at a temperature of 400 degrees and a pressure of 300 psi.

The jury learned that there are three acceptable methods for hot-condensate disposal in the industry: (1) recirculate the condensate, (2) install a French drain, or (3) allow the condensate to discharge into a concrete-lined ditch. Dean Baker, an employee with DuPont at the La Porte facility at the time the piping was constructed, told the jury that the purpose of a French drain is to prevent ground degradation or erosion in the area. And, the jury saw D.B. Western's original proposed design drawing for handling discharge, Plaintiff's Exhibit 267—a French drain.

Notwithstanding D.B. Western's proposal, according to Oscar Gonzalez, "a conscious decision was made by DuPont's design team to remove four of the six French drains." According to Dennis Beatham, DuPont engineers vetoed his French Drain drawing. Thus, it was a DuPont decision to omit a French drain system to accommodate the 400–degree condensate emitting from the steam trap at 300 psi. Ultimately, DuPont did not substitute one of the other two acceptable drainage systems for the French drain. Thus, DuPont decided that no drainage system would be used.

When DuPont omitted the French drain and substituted no drainage system whatsoever, it created the hollowing condition. Specifically, a French drain works like a gutter beneath a downspout, not only because it directs the flow of the hot water but also because it reduces the pressure at which the water hits the ground from approximately 300 psi to 0 psi. When hot condensate hits the ground at 300 psi, it creates a hole. Had DuPont recirculated the hot condensate—there is no drainage and, therefore no hole. Had DuPont pro-

vided a concrete-lined pit, the hole and the pooling still exists, but the pressure is applied to concrete so there is no risk of ground degradation or erosion in the area. Without any drainage, the 400–degree water hitting the ground at 300 psi created not only a pool of hot water, but also erosion of the soil beneath the steam trap.

In this case, however, no drainage of hot condensate created a problem far larger than mere erosion of the soil because in this case there were different types of soil at different layers. The jury heard testimony about the top layer of soil—clay. The jury also heard that lower levels of soil were silt or sand. Clay does not erode as easily as silt. Clay rooted with grass erodes even less. So, when hot condensate hits the soil of different types in layers, such as clay on top of silt, at 300 psi, it does not merely create a hole straight down. Instead it causes erosion at different rates. As the hot condensate hits the soil and begins to create the hole, the clay, particularly clay rooted with grass, remains in place while the silt layers beneath erode. It's called differential erosion. When the layer of clay remains and the layer of silt disappears, the condition of hollowing occurs and the ledge results. DuPont created the condition. DuPont did not use a shovel to create the hollowing of soil; it used un-drained and un-dissipated 400–degree, 300–psi condensate.

C. **There is evidence that there was a sufficient probability of a harmful event occurring that DuPont knew or should have known that the event, or some similar event, was likely to happen.**

As outlined above, the condition is the hollowing through erosion that created the ledge.

*1. DuPont knew the event or a similar event was likely to happen.*

With regard to the hazard of the condition, the jury first learned that the erosion of any soil caused by hot condensate exploding from a steam trap is a dangerous condition. Specifically, Dean Baker from DuPont told the jury that it is unsafe not to have anything for condensate disposal because if there isn't anything to catch the condensate released at 300 pounds of pressure, it's going to erode the ground. Baker's testimony is supported by DuPont's own written standard for condensate disposal. The standard directs, "Condensate shall not be discharged into open ditches, French drains, or sewers without approval of Design, Plant or Construction authority." The same standard further directs that if the design contemplates an open discharge of condensate, the preferred method is to lower the temperature of the condensate to a safe level and then discharge it or to use "a suitable catch tank (see P12B) or a properly designed French drain (see P6D)." Thus, DuPont's own standard forbids condensate disposal into an open pit, such as occurred where Roye was injured. Note that this standard requiring drainage is not a standard applicable solely to variable soil. It is the standard for all soil. Thus, there is some evidence that DuPont knew that the failure to supply a drainage system—any drainage system—not only violated its own standard but also was dangerous because of the effects of erosion.

Significantly, the jury learned that DuPont did not merely miscalculate the need for a French drain; DuPont calculated the risk and accepted it. Specifically, DuPont's design engineers made the conscious decision to omit only four of the six French drains that were designed into the system. The sole reason that DuPont declined French drains in those four areas, though it was a departure from its own standard, was because those four areas did

not have as much traffic—not as many people walking around. Stated differently, where DuPont knew many people would be walking around, it installed French drains. Where DuPont knew fewer people would be exposed to the hazard, it did not. Roye was one of the individuals for whom DuPont calculated and accepted the risks posed by no French drain.

Standing alone, the above-outlined evidence that ordinary erosion is unsafe and DuPont created a circumstance of erosion at a location it knew workers would need to maintain the steam trap is sufficient to infer knowledge and submit the question to the jury. Specifically,

(1) DuPont created the condition, hollowing from erosion;

(2) Erosion for failure of a condensate drainage system is an unsafe condition;

(3) DuPont knew that it was a dangerous condition because the purpose of the industry-standard drainage is to prevent erosion; and

(4) DuPont deliberately created the hazard only in areas not subject to high traffic because it was an extraordinary hazard.

This is circumstantial evidence of actual knowledge. *See Keetch*, 845 S.W.2d at 266 (citing *Coffee*, 536 S.W.2d 539).

***2. DuPont should have known the event or a similar event was likely to happen.***

The danger of erosion became even more dangerous because of the variable soil that turned ordinary erosion into differential erosion. And, DuPont knew about the variable soil in the area where Roye suffered injury. Specifically, the jury saw an October 2000 email from Donald Johnson, a DuPont geotechnical consultant. Johnson evaluated boring and soil data in the same area where DuPont omitted the

French drain. These soil borings were not conducted for purposes of deciding the appropriate hot-condensate drainage. DuPont conducted soil borings to determine the necessary depth of the drill shaft construction for the pipe rack support system. And, Johnson noted that most, but not all, of the borings showed clay "throughout the soil profile." However, he warned that in one particular boring he found "sand below 8 feet." He cautioned, "While the sand is acceptable for support, ... it may create hole cave-in problems necessitating casing of the hole or slurry construction." Finally, he warned, "Careful inspection is essential to detect stability problems and the need for special procedures."

Although the soil data did not come to DuPont in connection with the drainage-system proposal, at least one DuPont representative should have known of the relationship between the boring data and the condensate drainage—John Ponder. In 2000, Ponder was serving as the liaison between D.B. Western, DuPont, and Harmony during the steam pipe construction. As a "first line supervisor," Ponder was "very familiar with DuPont rules, procedures, and protocols." During trial, Ponder acknowledged that he had reviewed the D.B. Western French drain design. His initials are on the design sketch. No more than one month later, a D.B. Western representative wrote to Ponder informing that D.B. Western needed DuPont's decision on the drainage for the steam trap immediately. Specifically, the letter stated, "We need to know quickly if we have to drill these pits when we have drilling done for Bell Piles." The Bell Piles are the piling referred to in the soil boring report from Johnson. D.B. Western was telling Ponder that it wanted, for efficiency reasons, to prepare the holes for rack support—which might need reinforcement due to sand—at the same time it dug a drainage system. Finally, Roye's expert

witness, James Knorpp of Knorpp Safety, tied this evidence together for the jury. Knorpp is a retired, 30–year safety engineer for OSHA, who formed his own safety consulting firm in 1994; so he brought 50 years of experience to the jury. Based upon the documentation Knorpp reviewed, including the above referenced documents, he opined that

- "DuPont knew that the French drains should be under each of the six steam traps on the 300–pound line" and originally intended to install them;
- Without a French drain, hot condensate spitting out of the steam trap has a tendency to erode the soil where it hits and pool;
- Soil conditions must be considered with condensate drainage because the soil must be capable of absorbing the water;
- DuPont had information about the variable soil conditions in the area and should have considered it when making a decision whether to dispose of condensate directly to the ground;
- Under these circumstances, without a French drain, the hazard (hollowing under the top soil) could be reasonably expected to occur; and
- "[T]he root cause [of Roye's accident] was that there was a failure to install the safe—proper safety equipment—that is, French drain equipment or other collection media—at the time this equipment was designed and constructed and a failure to properly evaluate the hazard that could ultimately result."

The majority notes that Johnson's soil-borings email does not address steam traps or the necessity of a French drain. Lynn Ratcliff, DuPont's expert, also concluded that the two issues were "totally unrelated" because Johnson's caution meant that when the pilings were drilled there was a danger that the sand layer at eight feet might collapse. The jury was free to disregard Ratcliff's testimony and accept Knorpp's testimony and infer that DuPont should have recognized the relationship between the two issues inasmuch as D.B. Western wanted to dig the drainage pit at the same time it dug the hole for the supporting rack. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). DuPont had all that it needed to know that the dangerous condition caused by erosion was exacerbated by the variable soil.

## D. Conclusion

In summary, I respectfully dissent to the decision to reverse the jury's verdict. *Keetch v. Kroger* is still Texas law. Owner-created conditions that pose an unreasonable risk of harm give rise to a jury question on knowledge—actual knowledge. *CMH Homes, Inc. v. Daenen* does not constitute a develops-over-time exception to *Keetch.*

The jury heard evidence that (1) DuPont created the condition and (2) there was a sufficient probability of a harmful event occurring that DuPont knew or should have known that the event, or some similar event, was likely to happen. DuPont deliberately departed from industry standards and created an unreasonable risk of harm to a few on its premises while shielding others from it. Roye was one of the few. The jury determined DuPont had knowledge and we should honor that decision.